J. S66031/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| RODNEY TALBO SHELTON, | : | No. 2122 EDA 2018 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered June 22, 2018,
in the Court of Common Pleas of Delaware County
Criminal Division at No. CP-23-CR-0000147-2017

BEFORE:  STABILE, J., NICHOLS, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        Filed: September 10, 2020

Rodney Talbo Shelton appeals from the June 22, 2018 judgment of sentence entered by the Court of Common Pleas of Delaware County following his conviction in a jury trial of second-degree murder, robbery-inflict serious bodily injury, possession of a firearm with manufacturer number altered, possession of a firearm by a prohibited person, and firearms not to be carried without a license.[1]  The trial court sentenced appellant to the mandatory minimum sentence of life imprisonment without the possibility of parole.  After careful review, we affirm.

The trial court set forth the following factual and procedural history:

> In the early morning of June 9, 2015, Thomas Childs
> arrived to work as a delivery truck driver at Ridgeway

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 6110.2(a), 6105(a)(1), and 6106(a)(1), respectively.

Industries at 6250 Baltimore Avenue, Yeadon Borough, Delaware County, Pennsylvania. At roughly 3:30 a.m., [appellant] approached Mr. Childs and attempted to rob him using a 9-millimeter high-point firearm. A struggle ensued, during which two shots were fired. The second shot struck Mr. Childs in the back and became lodged in his spine, proving to be a fatal injury. [Mr.] Childs died at the crime scene as a result of his gunshot wounds. Kevin Knoblauch, a coworker of Mr. Childs, was showing up for work around the time of the murder and was later able to identify [appellant] in a police lineup.

Police found a 9-millimeter high-point gun abandoned in a cemetery neighboring the industrial park, along with loose cash and Mr. Childs' cell-phone. Ms. Sinoma Smith originally purchased the gun at Chauncey's Pawn & Gun in Elizabeth City, North Carolina. Ms. Smith gave the gun to [appellant] following her felony charge and subsequent probation sentence. [Appellant] has no license to carry the gun. Ms. Jerusha Scott, an acquaintance of [appellant], testified that she recognized the gun used in the murder, and that she had previously seen it at her home. Furthermore, Yeadon Police Officers recovered bullets lodged into a tree on the property, as well as empty casings, after searching Ms. Smith's residence in Camden, North Carolina. Detective Louis Grandizio of the Delaware County Criminal Investigation Division ("CID") testified after conducting a forensic analysis of these bullets and casings, concluding in his report that unique markings matched the bullets that were recovered during Mr. Childs' autopsy. After Detective Grandizio tested the gun, it was later sent to Katherine Cross at Guardian Forensic Sciences for a DNA analysis. Ms. Cross testified her results were inconclusive because the gun contained DNA samples from two unidentified males. This matched the results of DNA testing conducted by agent Lauren Force of the Pennsylvania State [P]olice, which were also deemed inconclusive.

Following the robbery and the murder of Mr. Childs, [appellant] traveled roughly 800 miles south;

U.S. Marshals arrested [appellant] in Georgia 18 months after Mr. Childs' death. Detectives Joseph Houghton and Michael Jay of the Yeadon Police Department and CID, respectively, interviewed [appellant] on December 12, 2016. After having [appellant] sign a **Miranda**[2] warning form, the [d]etectives spoke with [appellant] off the record for about two hours, followed by an interview on the record for about thirty minutes. [Appellant] confessed to the murder during the recorded portion of their conversation. [Appellant] admitted he was "tired of running" and to taking significant steps to change his appearance—such as growing his hair out, filling in his tattoos, and removing his freckles. During the trial, the Commonwealth showed the jury a YouTube video published by [appellant] 83 days following Mr. Childs' murder that depicted a similar event, and where [appellant] more closely resembles his former physical appearance. After his confession, [appellant] was transported to the Darby Borough Police Department in connection with the murder. While in custody at the George Hill Correctional Facility in Delaware County, [appellant] was recorded talking on the phone with a friend expressing his desire to accept a guilty plea, as well as expressing remorse for the situation. On April 2, a jury trial commenced where [appellant] was accused of first, second, and third degree murder. During the process of jury selection, the Commonwealth and [d]efense counsel were each entitled to 9 peremptory strikes, for a total of 18 strikes. The Commonwealth used 7 of their peremptory strikes against female jurors 4, 31, 35, and 36 as well as African-American jurors 7, 18, and 19, prompting [d]efense counsel to raise a **Batson**[3] challenge with the trial [court.] After discussion wherein the Commonwealth provided race neutral reasons for the strikes, the trial [court] allowed the peremptory strikes to stand.

---

[2] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

[3] **See Batson v. Kentucky**, 476 U.S. 79 (1986).

Trial court opinion, 7/22/19 at 1-4 (bolding and italics added).

On April 6, 2018, a jury convicted appellant of the aforementioned offenses. The trial court sentenced appellant to a mandatory minimum term of life imprisonment without possibility of parole for the second-degree murder charge pursuant to 18 Pa.C.S.A. § 1102(b) on June 22, 2018.

Appellant filed a timely notice of appeal on July 16, 2018. The trial court ordered appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and appellant timely complied. The trial court subsequently filed an opinion pursuant to Pa.R.A.P. 1925(a) on July 22, 2019.

Appellant presents the following issues for our review:

1. Whether the verdict of guilty of Second Degree (Felony) Murder, Possession of a Firearm with Obliterated Manufacturer's Number, Persons not to Posses [sic] Firearms and Firearms not to be Carried without a License, are based upon insufficient evidence?

2. Whether the trial court committed error of law and abuse of its discretion in overruling [a]ppellant [sic] challenge under **Batson vs. Kentucky**, to strikes of seven African American and female jurors?

3. Whether [a]ppellant's confession was obtained in violation of his right to due process of law and against self[-]incrimination, guaranteed [a]ppellant by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article [I] Sections 8 and 9 of the Pennsylvania Constitution, where, under the totality of the circumstances, the confession was involuntary in that it was not the product of [a]ppellant's free will and unconstrained choice, but, instead, was the result of manipulative,

coercive and overreaching interrogation by police[?]

4.      Whether the trial court committed error of law and abuse of its discretion in admitting into evidence the recording and transcript of a telephone call of [a]ppellant wherein [a]ppellant speaks of a potential sentence he might agree to?

5.      Whether the trial court committed error of law and abuse of its discretion in admitting into evidence a video depicting [a]ppellant being shot while running from an automobile?

6.      Whether the trial court committed error of law and abuse of its discretion, in allowing the Commonwealth's DNA expert to testify to matters not contained within her report?

Appellant's brief at 5-6.

## I.

In his first issue, appellant contends that the Commonwealth failed to produce sufficient evidence to warrant his convictions of second-degree murder, possession of a firearm with an obliterated manufacturer's number, persons not to possess firearms, and firearms not to be carried without a license.

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by

the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (internal quotations and citations omitted). Importantly, "the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence." *Commonwealth v. Ramtahal*, [], 33 A.3d 602, 607 ([Pa.] 2011).

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-337 (Pa.Super. 2019).

In his brief, the overarching focus of appellant's sufficiency claim is on the jury's credibility determinations as it relates to testimony from Kevin Knoblauch, Jerusha Scott, and Sinoma Smith. (*See id.* at 34-42.) It is well

settled that challenges to the credibility of the evidence are actually challenges to the **weight** of the evidence. **Commonwealth v. Mbewe**, 203 A.3d 983, 987 (Pa.Super. 2019), citing **Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa.Super. 2013), **appeal denied**, 76 A.3d 538 (Pa. 2013). Credibility determinations are within the sole purview of the jury, and appellate courts will not substitute their credibility determinations for that of the jury. **Commonwealth v. Izurieta**, 171 A.3d 803, 809 (Pa.Super. 2017), citing **Commonwealth v. Crawford**, 718 A.2d 768, 772 (Pa. 1998). Accordingly, appellant's first issue is without merit.

## II.

Appellant next argues that the trial court erred when it sustained the Commonwealth's peremptory strikes of seven members of the jury pool. (Appellant's brief at 42.) In the instant case, the record reflects that the final jury panel consisted of two African Americans; additionally, one of the alternates seated was African American. (Notes of testimony, 4/3/18 at 20-21.) Appellant is African American. (**Id.** at 8.) This court has set forth the following standard of review for **Batson** challenges:

> A **Batson** claim presents mixed questions of law and fact. Therefore, our standard of review is whether the trial court's legal conclusions are correct and whether its factual findings are clearly erroneous.
>
> In **Batson**, the [Supreme Court of the United States] held that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the United States Constitution.

When a defendant makes a *Batson* challenge during jury selection:

> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.
>
> *Commonwealth v. Edwards*, 177 A.3d 963, 971 (Pa.Super. 2018) (citations and quotation marks omitted). "The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent or engaged in purposeful discrimination." *Commonwealth v. Towles*, [] 106 A.3d 591, 602 ([Pa.] 2014) (citation omitted). This Court must give great deference to a trial court's determination that peremptory challenges were free of discriminatory intent, and we will not overturn the determination unless it was clearly erroneous. *See id.*

*Commonwealth v. Scott*, 212 A.3d 1094, 1105-1106 (Pa.Super. 2019),

*appeal denied*, 222 A.3d 383 (Pa. 2019).

Here, appellant contends that the Commonwealth improperly struck seven jurors—three African Americans and six women.[4] (Notes of testimony, 4/2/18 at 241.) Specifically, appellant argues that the trial court erred when

---

[4] The record reflects that two of the African American jurors on whom the Commonwealth used a peremptory strike were women. (Notes of testimony, 4/2/18 at 241.)

it sustained the Commonwealth's peremptory strikes of Juror Nos. 4, 7, 18, 19, 31, 35, and 36.[5] (Appellant's brief at 42.) We shall address each juror individually.

**Juror No. 4:**

Appellant first contends that Juror No. 4 was improperly struck by the Commonwealth because she previously served on a hung jury. (Appellant's brief at 44, citing notes of testimony, 4/2/18 at 247-248.) The record reflects that Juror No. 4 served on a hung jury in a driving under the influence ("DUI") case in Delaware County in 2008. (*Id.* at 49.) Juror No. 4 also indicated that there was nothing about her previous jury experience that would have caused her to not be able to serve as a juror again or render any bias toward or against either the Commonwealth or appellant. (*Id.* at 49-50.) The Commonwealth explained that it used a peremptory strike on Juror No. 4 based on concern that "based upon her past experiences as a juror[, she may be] unable to make a decision." (*Id.* at 247.)

---

[5] Appellant does not provide any discussion in his brief as to the peremptory strikes used by the Commonwealth on Juror Nos. 7 and 36. (*See* appellant's brief at 43-45.) Accordingly, appellant waives any *Batson* claim as to Juror Nos. 7 and 36. *See Commonwealth v. Charleston*, 94 A.3d 1012, 1022 (Pa.Super. 2014), *appeal denied*, 104 A.3d 523 (Pa. 2014), quoting *Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa.Super. 2007), *appeal denied*, 982 A.2d 509 (Pa. 2009) ("We shall not develop an argument for [the appellant], nor shall we scour the record to find evidence to support an argument; consequently, we deem this issue waived." (brackets in original)).

**Juror No. 18:**

Next, appellant argues that the Commonwealth improperly used a peremptory strike on Juror No. 18, an African American man. (Appellant's brief at 44; *see also* notes of testimony, 4/2/18 at 242-244.) The Commonwealth provided the following reasoning for using a peremptory strike on Juror No. 18:

> [S]o when he initially was voir dired he indicated that he was less likely to believe a police officer. When questioned upon it he hesitated. I wrote that in my notes. Then he also checked off yes for do you have any religious, moral or any other beliefs that would allow you to sit in judgment of somebody. I believe that is what the wording was. And he indicated he couldn't remember and he was kind of hesitant with a lot of his responses which concerns me that he will be indecisive when deliberating. But I do remember him like I said he clearly hesitated [when answering the] less likely [to believe a] police officer [question].

Notes of testimony, 4/2/18 at 244.

Appellant's argument pertaining to Juror No. 18 is limited to an allegation that the trial court "failed to note whether [Juror No. 18] exhibited the behavior ascribed by the Commonwealth." (Appellant's brief at 44, citing notes of testimony, 4/2/18 at 244.)

**Juror No. 19:**

Appellant then avers that the Commonwealth improperly used a peremptory strike on Juror No. 19, an African American woman. (Appellant's brief at 44, *see also* notes of testimony, 4/2/18 at 242-245.) The

Commonwealth noted the following reasons for exercising a peremptory strike:

> So this was a juror that was absent for a significant period of time. I have concerns that she doesn't have the ability to follow instructions. There was also I think somewhat of a language barrier when we were speaking with her. She had a very, very heavy accent. Additionally she lives in Yeadon and she said she had heard nothing about this case which I find highly unlikely being that this was in the press for quite some time.

Notes of testimony, 4/2/18 at 244-245.

Appellant argues that "the record is devoid of any information as to what exactly the juror was absent from, nor does it appear that either the Commonwealth or the trial court assessed whether the juror was possessed with an adequate understanding of the English language so as to be able to serve[.]" (Appellant's brief at 44, citing notes of testimony, 4/2/18 at 244-245.)

**Juror No. 31:**

Next, appellant argues that the Commonwealth improperly used a peremptory strike on Juror No. 31, a woman. (Appellant's brief at 44; **see also** notes of testimony, 4/2/18 at 246.) The Commonwealth averred that it exercised a peremptory strike on Juror No. 31 because:

> [Juror No.] 31 is a law clerk. I have concerns with having somebody that has somewhat of a sophisticated legal background on the jury. She also indicated that her husband had a DUI. I have a little bit of a concern about that as well. But it wasn't strictly on her being female.

Notes of testimony, 4/2/18 at 246-247.

Appellant specifically argues that Juror No. 31 was not asked whether her contact with the criminal justice system might color her assessment of the evidence. (Appellant's brief at 44, citing notes of testimony, 4/2/18 at 246-247.)

**Juror No. 35:**

Finally, appellant contends that the Commonwealth improperly struck Juror No. 35, a woman. (Appellant's brief at 44; *see also* notes of testimony, 4/2/18 at 246.) The Commonwealth stated that the decision to exercise a peremptory strike on Juror No. 35 "was based upon her profession. I tend to not put engineers on my jury panel in light of their thought processes." (Notes of testimony, 4/2/18 at 246.)

Appellant argues that "one is hard pressed to understand what it is about an engineer's 'thought processes' that would deem *any* such professional unfit to serve on a jury[.]" (Appellant's brief at 44 (emphasis in original).)

The trial court denied appellant's *Batson* motion, finding that the Commonwealth gave a non-biased reason for exercising its peremptory strikes. (Notes of testimony, 4/2/18 at 248.) In its Rule 1925(a) opinion, the trial court concluded that, "[t]he Commonwealth met its evidentiary burden [under *Batson*] because none of the reasons [it] provided were merely a rebuttal or claim of good faith, but rather cited individual and specific reasons

- 12 -

for striking each juror." (Trial court opinion, 7/22/19 at 8, citing **Batson**, 476 U.S. at 97-98, **Alexander v. Louisiana**, 405 U.S. 625, 629-631 (1972).) Based on our review of the record, we can discern no legal error on the part of the trial court. Accordingly, we find that appellant's second issue is without merit.

## III.

Appellant next argues that the trial court erred when it denied his pre-trial motion to suppress evidence of his confession on the grounds that his confession was not voluntary. (Appellant's brief at 46.)

We review the denial of a motion to suppress using the following standard of review:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

***Commonwealth v. Jones***, 121 A.3d 524, 526-527 (Pa.Super. 2015), ***appeal***

***denied***, 135 A.3d 584 (Pa. 2016), quoting ***Commonwealth v. Jones***, 988

A.2d 649, 654 (Pa. 2010) (internal citations and quotation marks omitted).

> A confession obtained during a custodial interrogation is admissible where the accused's right to remain silent and right to counsel have been explained and the accused has knowingly and voluntarily waived those rights. The test for determining the voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession.
>
> ***Commonwealth v. Jones***, [] 170, 683 A.2d 1181, 1189 ([Pa.] 1996) (citations omitted). []The Commonwealth bears the burden of establishing whether a defendant knowingly and voluntarily waived his ***Miranda*** 'rights.'[Footnote 3] ***Commonwealth v. Bronshtein***, [] 691 A.2d 907, 913 ([Pa.] 1997) (citation omitted).
>
>> [Footnote 3] ***Miranda v. Arizona***, 384 U.S. 436 [] (1966).
>
> ***Commonwealth v. Davis***, 861 A.2d 310, 317 (Pa.Super. 2004), ***appeal denied***, [] 872 A.2d 171 ([Pa.] 2005).
>
> When deciding a motion to suppress a confession, the touchstone inquiry is

> whether the confession was voluntary. Voluntariness is determined from the totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.
>
> ***Commonwealth v. Nester***, [] 709 A.2d 879, 882 ([Pa.] 1998) (citations and footnote omitted).
>
> When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.
>
> ***Id.*** at [] 882 (citations omitted).

***Commonwealth v. Harrell***, 65 A.3d 420, 433-434 (Pa.Super. 2013), ***appeal denied***, 101 A.3d 785 (Pa. 2014).

Here, appellant admits that while he was given ***Miranda*** warnings, "the warnings did not serve their purpose, and [a]ppellant's rights against self[-]incrimination and to counsel[] were not voluntarily waived." (Appellant's brief at 52.) Specifically, appellant contends that his confession

"was not the product of his own free will but, instead, was involuntarily induced by the interrogation tactics of [the] police." (***Id.*** at 49.)

In denying appellant's suppression motion, the trial court concluded as follows:

> Here, the will of [appellant] was not overborne by any coercive or overreaching police conduct. [Appellant] told detectives, "[I] didn't mean to shoot [Mr. Childs]. . . . but obviously you know I know I pulled the trigger and then I just [ran off]." [(Notes of testimony, 12/12/16 at 2.) Appellant] went on to say, "[At] that moment I wanted to say something to somebody and actually stand there like a fool knowing that I just did this crime and say something [about] what I had done." [(***Id.***)] This interview was conducted on December 12, 2016, at the Dekalb County Sheriff's Office — about 18 months following Mr. Childs' murder — because [appellant] fled the [Commonwealth] of Pennsylvania and evaded the law in the intervening months. [Appellant] told the Yeadon Borough Police Department, after apologizing to Mr. Childs and his family, that he was "tired of running." [(***Id.*** at 22.)]
>
> The detectives conducted a pre-interview off the record for approximately two hours before recording their interview with [appellant] because it is not standard police practice to go immediately on the record with a suspect. [Appellant] verbally indicated to the detectives that he understood the ***Miranda*** warning recited to him, and [appellant] initialed a form waiving his right against self[-]incrimination and his right to counsel before speaking on the record. [(***Id.***)]

Trial court opinion, 7/22/19 at 6 (some brackets in original, bolding and italics added); ***see also*** trial court order denying appellant's motion to suppress, 7/11/17 at 1-5.

After a careful review of the record, viewing the totality of the circumstances of appellant's statements to police, the record supports the trial court's factual findings and legal conclusions. Therefore, appellant's third issue is without merit.

**IV.**

In his next three issues, appellant raises challenges to evidentiary rulings by the trial court. When reviewing evidentiary rulings by the trial court on appeal, we use the following standard of review:

> "When reviewing the denial of a motion *in limine*, [appellate courts] appl[y] an evidentiary abuse of discretion standard of review. . . . It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion." [*Commonwealth v.*] *Rivera*, 983 A.2d [1211,] 1228 [(Pa. 2009)] (citation and quotation marks omitted). Thus, the Superior Court may reverse an evidentiary ruling only upon a showing that the trial court abused that discretion. *Commonwealth v. Laird*, [] 988 A.2d 618, 636 ([Pa.] 2010). A determination that a trial court abused its discretion in making an evidentiary ruling "may not be made 'merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.'" *Id.* (quoting *Commonwealth v. Sherwood*, [] 982 A.2d 483, 495 ([Pa.] 2009)). Further, discretion is abused when the law is either overridden or misapplied. *Commonwealth v. Randolph*, [] 873 A.2d 1277, 1281 ([Pa.] 2005).

*Commonwealth v. Hoover*, 107 A.3d 723, 729 (Pa. 2014).

In his fourth issue, appellant avers that the trial court committed an abuse of discretion when it admitted into evidence a portion of a recorded telephone call during which appellant discussed accepting a potential plea deal. (Appellant's brief at 52.) Specifically, appellant alleges that the trial court erred when it admitted a recording of the following statement into evidence that was recorded while appellant was incarcerated at the George H. Hill Correctional Facility:

> . . . if I could swing that s**t down to like 10 or something like that, then I can pull that man. I ain't gonna (sic) sit here and say, you know, but if I can get the jawn[6] down to 10 then I'll be alright on that man.

*Id.*, quoting Exhibit C-100 at unnumbered page 1.

Appellant contends that the recording is not relevant. (Appellant's brief at 56.) Specifically, he argues that he "only speaks of the length of a prison sentence; he doesn't admit to the crime, nor does he commit to bringing about such a sentence in any particular fashion[.]" (*Id.*) Appellant further argues that it is not clear in the recording that he's even considering accepting a guilty plea; rather he could be considering a sentence after a guilty verdict or a plea of *nolo contendere*. (*Id.*)

> Relevance is the threshold for admissibility of evidence; evidence that is not relevant is not admissible. *Commonwealth v. Cook*, [] 952 A.2d

---

[6] The Oxford Dictionary defines "jawn" as dialect chiefly used in eastern Pennsylvania to "refer to a thing, place, person, or event that one need not or cannot give a specific name to." *Jawn Definition*, lexico.com, https://www.lexico.com/en/definition/jawn (last visited July 8, 2020).

594, 612 ([Pa.] 2008); Pa.R.E. 402. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." ***Commonwealth v. Drumheller***, [] 808 A.2d 893, 904 ([Pa.] 2002) (citation omitted). Our Rules of Evidence provide the test for relevance: evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Further, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

***Commonwealth v. Leap***, 222 A.3d 386, 390 (Pa.Super. 2019), ***appeal denied***, ___ A.3d ___, 2020 WL 2465050 (Pa. May 13, 2020).

Here, the trial court concluded as follows:

[Appellant's] call from prison is relevant evidence because it addresses the issue of fact as to whether or not [appellant] was coerced into giving a confession. [Appellant] talks openly regarding his willingness to negotiate a deal with the [Commonwealth], as well as statements such as, "that was the last straw man. That's what it took to make my hard-headed ass stop." [(Notes of testimony, 4/6/18 at 173-184.)] These statements were used to show [appellant's] feelings of guilt and culpability, and helped the Commonwealth to refute [appellant's] claims of being coerced into a confession during cross[-]examination.

Trial court opinion, 7/22/19 at 18.

Based on our review of the record, we find that the trial court did not abuse its discretion when it admitted evidence of a portion of a recorded

telephone call during which appellant discussed accepting a potential plea deal on the basis of relevance.

Our inquiry, however, cannot end here. Appellant also contends that the record was admitted into evidence in violation of Pa.R.E. 410, which excludes "any statement made in the course of plea discussions with an attorney for the prosecuting authority which does not result in a plea of guilty or which results in a plea of guilty later withdrawn." (Appellant's brief at 54, citing Pa.R.E. 410(a)(4).) Appellant admits that at the time the recording at issue was made, appellant was not speaking with an attorney for the Commonwealth, which, therefore, would not bar the recording's admission into evidence under Rule 410; however, appellant argues that because he had an expectation of negotiating a plea deal with the Commonwealth at the time of the recording, the recording was admitted in error. (Appellant's brief at 54-55.)

Our supreme court has held the following:

> Not every statement making reference to a deal or omission of jail time is necessarily a plea discussion for purposes of this rule. ***Hutto v. Ross***, 429 U.S. 28 [] (1976). First, the accused must exhibit an actual subjective expectation to negotiate a plea at the time of the discussion; and second, the accused's expectation must be reasonable given the totality of the circumstances. ***Commonwealth v. Calloway***, [] 459 A.2d 795, 800-801 ([Pa.Super.] 1983) (adopting the Fifth Circuit's two-tiered analysis in ***United States v. Robertson***, 582 F.2d 1356 (5th Cir. 1978), for determining whether plea negotiations are underway). In ***Commonwealth v. Vandivner***, [] 962 A.2d 1170, 1181 ([Pa.] 2009), [our supreme

court] observed that "the very word negotiation posits the participation of two parties and not unilateral conduct," and specifically declared that:

> Of primary importance in assessing an accused's subjective expectation of negotiating a plea is whether the Commonwealth showed an interest in participating in such discussions. In line with this reasoning, voluntary, unsolicited statements uttered by an accused to authorities cannot be said to be made in furtherance of striking a plea bargain.
>
> *Id.* at 1181. *Vandivner* provides an example of an accused's statement that was not protected by Pa.R.E. 410 because there was no evidence that the Commonwealth showed an interest in participating in plea discussions at the time the accused gave his inculpatory statement.

*Commonwealth v. Burno*, 154 A.3d 764, 784 (Pa. 2017).

Here, we find that Rule 410 does not protect the statement at issue. Unlike the defendants in *Burno* and *Vandivner*, appellant did not make the statement at issue to a police officer or an attorney for the Commonwealth. *See id.* at 783 (statement at issue was made to an attorney for the Commonwealth); *Vandivner*, 962 A.2d at 1180 (statement at issue was made to police officers). Rather, appellant's statements at issue were made to a friend during a telephone call. Accordingly, such statements are not afforded protection under Pa.R.E. 410(a)(4). Therefore, the trial court did not abuse its discretion when it admitted evidence of a portion of a recorded telephone call during which appellant discussed accepting a potential plea deal.

**V.**

Fifth, appellant contends that the trial court abused its discretion when it admitted a YouTube video posted by appellant into evidence. (Appellant's brief at 56.) The trial court provided the following description of the video at issue:

> Here, [appellant] published a music video to YouTube that includes a scenario closely aligned with the facts of the murder of Mr. Childs. In the video, entitled "I Shouldn't Be Here," [appellant] portrays the victim of a violent robbery and homicide. [(Notes of testimony, 4/6/18 at 198, 202-203.) Appellant] is sitting in a vehicle when he is approached by a gunman, who pulls [appellant] out of the vehicle and shoots him in the back — mirroring the untimely demise of Mr. Childs in the Yeadon Industrial Park early on June 9, 2015, when police say someone shot him [at] point-blank range during a robbery. [(**Id.**)]
>
> On [September] 1, 2015, [Sinoma] Smith received a promotional text message from [appellant] asking her to watch the newly published "I Shouldn't Be Here" video. [(Notes of testimony, 4/3/18 at 169-170.)] Ms. Smith testified that she had "never known [appellant] to have hair on his head," and that his physical appearance in the rap video — notably, [appellant] has a shaved head — matched his typical appearance prior to the murder of Mr. Childs. [(**Id.**) Appellant,] who fled Pennsylvania and was found 18 months later in Georgia, altered his physical appearance subsequent to the murder of Mr. Childs, including removing freckles from his face and growing out his hair. [(Notes of testimony, 4/5/18 at 48-49.)]

Trial court opinion, 7/22/19 at 14-15.

This court's decision in **Commonwealth v. Talbert**, 129 A.3d 536 (Pa.Super. 2015), **appeal denied**, 138 A.3d 4 (Pa. 2016), governs here. The

defendant in **_Talbert_** was charged with two counts of first-degree murder and other related charges following a shooting in which the victims died of multiple gunshot wounds. **_Id._** at 537. During the trial, the trial court admitted a music video "that allegedly contained lyrics describing a crime similar to the murders at issue in [the] case." **_Id._** at 538 (citation omitted). The defendant appealed, claiming that "it was impossible to conclude that the rap specifically referred to the murders in question," and that the video was "irrelevant and unfairly prejudicial," thereby entitling the defendant to a new trial. **_Id._** (citations omitted).

This court affirmed the defendant's judgment of sentence, holding as follows:

> To expect rap lyrics, which are a form of artistic expression, to communicate a criminal event in precise detail would be wholly unreasonable. **_See_**, **_e.g._**, **_Holmes v. State_**, 306 P.3d 415, 419 (Nev. 2013) (stating that "defendant-authored rap lyrics may employ metaphor, exaggeration, and other artistic devices, and can involve abstract representations of events or ubiquitous storylines. But these features do not exempt such writings from jury consideration where [] the lyrics describe details that mirror the crime charged.") (citations and quotations omitted). Taken as a whole, we conclude that [the defendant's] rap video is relevant to show his involvement in these murders. **_See_** [**_Commonwealth v._**] **_Flamer_**, 53 A.3d [82,] 89 [(Pa.Super. 2012)] (holding that the trial court abused its discretion by finding defendant's rap lyrics to be irrelevant and prejudicial, where lyrics about people "keeping their mouths shut," sending friends to kill for him, and "popping shells" in people that "run their mouth" had a tendency to show a conspiratorial agreement.); **_see also United States v. Stuckey_**,

> 253 Fed.Appx. 468, 482 (6th Cir. 2007) (concluding that rap lyrics were relevant because the lyrics concerning the killing of government witnesses was precisely what the government accused the defendant of doing).

*Id.* at 541.

In its Rule 1925(a) opinion, the trial court noted the similarities between the instant case and the evidence considered by this court in *Talbert*, the United States Court of Appeals for the Sixth Circuit in *Stuckey*, and the Supreme Court of Nevada in *Holmes*.

> [Appellant] is free to express himself artistically, but he cannot argue that his expression is irrelevant to the present legal propositions when he is accused of the very crime his expression depicts. Like in *Talbert*, where the defendant's rap lyrics specifically referenced the neighborhood of the scene of the crime, the escape vehicle reflected in the record, and phrases that closely aligned with the injuries sustained by the victim of the crime, [appellant's] video includes specifics to the known facts of the murder of Mr. Childs, including the removal of the victim from a vehicle and the shooting of the victim in the back. And like in *Stuckey*, where a defendant's rap lyrics described precisely what the government accused [him] of doing, [appellant's] music video depicts a scene closely aligning to the facts of the murder of Mr. Childs.
>
> To be sure, [the trial] court does not expect rap music, which is a form of artistic expression, to communicate a criminal event in precise detail. It is understood that music of all varieties commonly involves abstract representations of events or ubiquitous storylines. However, as in *Holmes*, minor differences between the actual crime committed and the crime depicted in the art does not exempt the art from jury consideration where the details mirror the crime charged. Therefore, [the trial] court found that there

> was sufficient probative value to admit the YouTube
> video as evidence.

Trial court opinion, 7/22/19 at 16.

Based on our review of the record, we find that the trial court did not abuse its discretion when it admitted the YouTube video at issue into evidence. Accordingly, appellant's fifth issue is without merit.

**VI.**

In his final issue, appellant argues that the trial court erred when it permitted the Commonwealth's DNA expert, Katherine Cross ("Cross"), to "testify that had she known Detective Louis Grandizio had handled the firearm before she could test it, she would have cautioned against the DNA testing." (Appellant's brief at 58-59.) As a means of brief background, the Commonwealth called Ms. Cross to testify as an expert witness.[7] Ms. Cross testified that she conducted a DNA test on the firearm recovered from the crime scene. (Notes of testimony, 4/4/18 at 144-145.) She testified that neither appellant nor the victim, Mr. Childs, were the source of the male DNA recovered from the grips and trigger of the firearm. (*Id.*) Cross further testified, however, that after hearing Detective Grandizio testify that he handled the firearm prior to Ms. Cross's conducting a DNA test, she would have, "cautioned that the results may or may not have any significance

---

[7] Cross is a DNA analyst, serologist, and DNA technical leader at Guardian Forensic Sciences. (Notes of testimony, 4/4/18 at 135.)

because of the way -- the processing and things that happened to that weapon prior to [her] getting it." (**Id.** at 157-158.)

Expert testimony in a criminal trial is governed by Pennsylvania Rule of Criminal Procedure 573, which provides, in relevant part:

> If an expert whom the attorney for the Commonwealth intends to call in any proceeding has not prepared a report of examination or tests, the court, upon motion, may order that the expert prepare, and that the attorney for the Commonwealth disclose, a report stating the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; and a summary of the expert's opinions and the grounds for each opinion.

Pa.R.Crim.P. 573(B)(2)(b). As noted by appellant, our supreme court has held the following:

> Expert testimony is admissible in all cases, civil and criminal alike, "when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience." [**Commonwealth v. Walker**, 92 A.3d 766, 788 (Pa. 2014)] (quoting **Commonwealth v. Leslie**, [] 227 A.2d 900, 903 ([Pa.] 1967)). Even where an expert's testimony arguably went beyond the scope of his or her report, the defendant still bears the burden of proving he suffered prejudice from the admission of the testimony. **See Commonwealth v. Henry**, [], 706 A.2d 313, 326–327 ([Pa.] 1997).

**Commonwealth v. Poplawski**, 130 A.3d 697, 718 (Pa. 2015), **cert. denied sub nom. Poplawski v. Pennsylvania**, 137 S.Ct. 89 (2016).

Appellant contends that he suffered prejudice,

> in that he was unable to have [Ms.] Cross'[s] conclusions reviewed by **his own** expert, as to

- 26 -

> whether they are correct or subject to cross[-]examination, or have his expert obtain and analyze Detective Grandizio's DNA sample. Instead, [a]ppellant's counsel was left only to question [Ms.] Cross about other ways that "touch DNA" is deposited on an item and lost[.]

Appellant's brief at 61, citing notes of testimony, 4/4/18 at 162-163 (emphasis in original).

The trial court concluded that Ms. Cross's testimony did not have an appreciable effect on the outcome of the trial. Indeed, the trial court noted that her testimony had a:

> null effect on the outcome of the trial. It is important to recognize that her forensic report and testimony ultimately came back as inconclusive, due to the presence of multiple samples. Ms. Cross goes no further toward implicating [appellant] or misleading the jury in [its] interpretation of the evidence. Instead, she merely suggests that Detective Grandizio may have been the cause of the contamination which led to the inconclusive result.

Trial court opinion, 7/22/19 at 22.

Based on our review of the record, we can discern no abuse of discretion on the part of the trial court when it permitted Ms. Cross to testify pertaining to potential DNA contamination on the firearm. Accordingly, appellant's sixth issue is without merit.

Judgment of sentence affirmed.

Stabile, J. joins this Memorandum.

Nichols, J. concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/10/20